**In re M.B. HAYES, INC., Debtor.**

**M.B. Hayes, Inc., Plaintiff,**

**v.**

**Tak Chin Choi, et al., Defendants.**

**Bankruptcy No. 01–21054–8P1.**
**Adversary No. 02–203.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 17, 2003.

Richard C. Prosser, Stichter, Riedel, Blain & Prosser, Tampa, FL, for Debtor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OF DECISION

ALEXANDER L. PASKAY, Chief Judge.

The matter under consideration in this Chapter 11 case are three claims asserted by M.B. Hayes, Inc. (Debtor), in three separate counts against Tak C. Choi, Yuet N. Choi, Chan C. Choy, and Wai Cheng Choy, all doing business as Albert's Asian Bistro, Inc. (Owner–Defendants). On March 8, 2002, the Debtor originally filed the instant action seeking to foreclose its construction lien and for breach of contract (Document No. 1). The Debtor later amended its complaint joining additional defendants ("Third Party Defendants") and asserting a third claim for declaratory relief to determine the extent, validity, and priority of liens against the contract proceeds and the Owner–Defendants' real property (Document No. 27).[1]

The Owner–Defendants filed an answer and counterclaims seeking damages pursuant to Florida Statute 713 and declaratory relief as to the Third Party Defendants (Document No. 71). In addition, this Court allowed Keene Brothers, Inc. ("Keene Brothers") to intervene (Document No. 23). Keene Brothers, a subcontractor on the Project, filed a counterclaim and cross-claim against the Owner–Defendants asserting an interest in the contract proceeds and an equitable lien against the Owner–Defendants' real property (Document No. 24). This Court subsequently dismissed Albert's Asian Bistro, Inc. from the lawsuit.

This Court bifurcated the Debtor's claims and tried its claims to foreclose its construction lien and for breach of contract with the Owner–Defendants' counterclaims for relief pursuant to Section 713 Florida Statutes (Document No. 22).

This Court having considered the testimony of witnesses, the exhibits offered and admitted into evidence, the pleadings and stipulation offered by the parties, and the post-trial submissions by the parties, now finds and concludes as follows.

*I.*

On May 22, 2000, the Debtor entered into a stipulated sum contract with Wohup Development, Inc. to build a restaurant to be known as Albert's Asian Bistro (the Project)(Debtor's Exhibit No. 1). James H. Post signed the contract on behalf of the Debtor and Chan Choy signed the contract on behalf of the Owner–Defendants. The contract identified the architect as ROJO Architect. On August 1, 2000, the parties executed an addendum changing the owner's name from Wohup Development, Inc. to Tak C. Choi, Yuet N. Choi, Chan C. Choy, and Wai Cheng Choy, all doing business as Albert's Asian Bistro, Inc., previously defined as the Owner–Defendants.

The contract provided that the Debtor would commence work within ten days of the issuance of permits and substantially complete construction within 150 days. There were no penalties, however, for the Debtor's failure to complete the Project within this time.

The contract stipulated the sum of $707,965 for the work contemplated. The

---

1. The Debtor added the following defendants: Albert's Asian Bistro, Inc.; Hatten Contractors, Inc.; MCC Engineering and Surveying, Inc.; L.S. Curb Service, Inc.; Yagmin Ceiling and Drywall Co.; Cemex, Inc.; City Electrical Supply Co.; Louis Smith Electric, Inc.; D & E Diversified Services, Inc.; and Workers Temporary Staffing, Inc.

design and installation of an owner supplied Chinese arch and walkway was included in that price. The Debtor was entitled to periodic payments during the pendency of the construction subject to certain requirements. The Owner–Defendants were to make the final payment due on the contract no later than 30 days after the issuance of the final certificate, receipt of a certificate of occupancy, and receipt of all required lien waivers.

The contract provided a means by which the parties could vary its terms by the execution of mutually agreed upon change orders. A change order had to set forth in writing the change in work, adjustment in contract sum, if any, and adjustment in contract time, if any.

If the Debtor and Owner–Defendants could not agree on the terms of a change order, the architect could prepare a construction change directive with agreement by the Owner–Defendants. The construction change directive would direct the performance of the work but reserve for future determination the assessment of costs associated with the change. Under this procedure, the architect could later assess costs using one of three methods. Alternatively, the Debtor could keep an itemized accounting of the costs incurred in executing the change order—including labor, materials, equipment, insurance and other fees, and supervision—together with a reasonable allowance for overhead and profit. The architect determined all cost disputes for purposes of interim payments, subject to the rights of the parties to assert a formal claim.

To assert a formal claim, the parties had to do so in writing within 21 days of the occurrence of the event giving rise to the claim or the time that the claimant first recognized the condition giving rise to the claim, whichever occurred later. If the claim requested an increase in the contract price, the claimant had to initiate the claim before proceeding with the work, except in limited emergency situations. Claims for additional time had to include an estimate of the cost and probable effect of delay on the scheduled construction. In the case of continuing delay only one claim was required.

As is common in the construction business, the parties began to execute change orders almost immediately upon the Debtor's commencement of the Project. The vast majority of these change orders were at the Owner–Defendants' behest or for reasons beyond the control of the Debtor. As a consequence of these change orders, the estimated completion time for the Project was extended by a further 201 days, more than doubling the original time estimate.

In December 2000, the Debtor executed a change order recognizing some of these delays and assessing a delay charge of $4,155. The Debtor calculated the delay charge by multiplying $277 (the estimated daily cost of site supervision and overhead expenses) by 15 days. The Owner–Defendants refused to sign this change order. The architect was no longer associated with the Project, limiting the options available to the parties to settle the dispute for purposes of interim payments. Ultimately, the Debtor executed a substitute change order listing the additional days to be added to the completion time but omitting charges for those days (Debtor's Composite Exhibit No. 4). Although the Debtor verbally warned the Owner–Defendants that it would assess those charges at the end of the contract, it did not make a formal claim.

Thereafter, the Debtor excluded delay charges from its change orders and charged only for costs of materials and

labor.[2] Consistent with its promise to later add delay charges, the Debtor twice more executed change orders detailing additional days but assessing no charges.[3]

Eventually, the Debtor completed the Project with the exception of the installation of the Chinese arch and walkway. The Debtor could not complete this part of the Project due to difficulties in obtaining permits and problems in delivery caused by the Owner–Defendants. By this time, the Debtor was under extraordinary financial pressures caused by an ambitious expansion of its business. The timely collection of its accounts receivables was critical to its financial health. Accordingly, on September 20, 2001, the Debtor submitted its seventh and final draw request to the owner seeking $132,393.36 (Owner–Defendants' Exhibit No. 1). This amount represented the remaining balance on the stipulated sum and most but not all of the change orders agreed to by the parties.[4] It did not reflect a credit for the exclusion of the Chinese arch and walkway.

The Debtor also submitted an affidavit of payment of debts and claims (Debtor's Exhibit No. 3 and Owner–Defendants' Exhibit No. 1). In the affidavit, the Debtor certified that all subcontractors and materials and equipment suppliers had been paid except those listed in the affidavit. The Debtor excepted eleven sub-contractors or materials and equipment suppliers with aggregate claims exceeding $97,000 who had not been paid. The Debtor did not submit separate releases or waivers of liens from these unpaid subcontractors and suppliers as required by the contract. The Debtor's affidavit was also inaccurate as the Debtor did not include subcontractors and suppliers that it had failed to pay in connection with an earlier draw request for which payment had been received and certificates of payment issued (Owner–Defendants' Exhibit Nos. 5 and 6).

The Owner–Defendants refused to sign off on the Debtor's final draw request on the grounds that credit had not been given for the Debtor's failure to complete the Chinese arch and walkway. Otherwise, the Owner–Defendants did not dispute the amount sought. The Owner–Defendants did not make a formal claim for a reduction in the contract price.

The Debtor took no action to amend or supplement its application for payment. Instead, on October 26, 2001, the Debtor executed a change order reflecting a $21,000 credit for the Chinese arch and walkway and assessing delay charges in the amount of $56,508 resulting in a net increase of $35,508 (Debtor's Exhibit No. 5). On the same day, the Debtor executed another change order assessing a $2,000 charge for modifications to the air conditioning system (Debtor's Exhibit No. 6).

2. During the pendency of construction, the Debtor was variously represented by Vincent Rowley, a site supervisor; Michael Hayes, an officer and shareholder of the Debtor; and James M. Post, an officer and shareholder of the Debtor. Contrary to Choy's testimony, Post signed the majority of the change orders. At some point, Post became the majority shareholder of the Debtor.

3. It is undisputed that the owner agreed with these change orders, although he did not sign them.

4. The Court cannot reconcile the evidence and testimony as to amounts due under the contract and change orders. For example, the parties did not dispute the Debtor's calculation that Change Orders 1–23 resulted in a net increase to the contract of $34,822.31 (Defendant's Exhibit No. 1) and yet the sum of those Change Orders is $26,660 (Debtor's Composite Exhibit No. 4). Accordingly, unless specifically stated, the Court's findings as to amounts alleged under the contract shall not have preclusive effect in any subsequent proceedings between these parties.

The Owner–Defendants did not agree to these change orders and did not sign them.

On October 30, 2001, the Debtor sent the Owner–Defendants a letter of default (Owner–Defendants' Exhibit No. 3). The Debtor recorded a construction lien in the amount of $170,401.76 against the Owner–Defendants' real property on the same day (Debtor's Exhibit No. 2). The Debtor calculated the lien amount by adding the final draw request to the later assessed delay charges less a $14,000 credit for the uncompleted Chinese arch and walkway.[5]

## II.

It is undisputed that the Debtor satisfactorily completed the Project, other than the Chinese arch and walkway, and is entitled to be paid for its work subject to its own contractual obligations and limitations. It is also undisputed that most of the delay associated with the Project was caused by the Owner–Defendants or by circumstances beyond the Debtor's control. What is in dispute is the precise amount due under the contract and whether the Debtor has fulfilled each of the conditions precedent to trigger the Owner–Defendants' obligation to pay that amount so as to warrant the foreclosure of its construction lien.

The Debtor contends that the Owner–Defendants are contractually liable for the amounts stated in its construction lien and it is entitled to foreclose it. The Owner–Defendants argue that the Debtor breached its obligations under the contract because it did not (and could not) certify that all of its debts and obligations to subcontractors or suppliers of materials or equipment were satisfied or alternatively, obtain lien waivers from those subcontractors or suppliers of materials who had outstanding claims for work performed on the Project.

The Owner–Defendants also argue that the Debtor willfully exaggerated its claim of lien by failing to give proper credit for incomplete work and by including delay charges. The Owner–Defendants seek a determination that the lien is unenforceable and statutory damages.

■ Fraudulent liens are governed by Section 713.31 Florida Statutes. The statute attempts to address competing policy considerations between lienors who can record a lien against real property without court intervention to protect their pecuniary interests in constructing or improving it and owners who may be at risk of the lienor's overreaching. If a construction lien is found to be fraudulent it operates as a complete defense to any action to enforce the lien and also exposes the lienor to a claim for damages under the statute. The statute was amended in 1991 to eliminate good faith disputes from its reach. *Id.*

■ To prevail under the statute, defendants have the burden of persuasion to establish that the lienor has: 1) willfully exaggerated the amount of the lien; 2) willfully included a claim for work not performed or materials not furnished, or; 3) compiled the lien with willful and gross negligence as to amount. Fl.St. § 713.31(2)(a). In this case, the Owner–Defendants allege that the Debtor has willfully exaggerated the amount of its lien.

■ The case law is clear that inclusion of amounts not attributable to improvements of the real property or authorized by contract renders a lien unenforceable and fraudulent. *Skidmore, Owings and Merrill v. Volpe Construction Co.*, 511 So.2d 642, 644 (3rd DCA Fla.1987). *See also Levin v. Palm Coast Builders and Construction, Inc.*, 840 So.2d 316, 317 (4th DCA Fla.2003) [costs to maintain property

---

**5.** *See* FN. 3 above.

not improvements within meaning of lien law]; *Ponce Investments, Inc. v. Financial Capital of America,* 718 So.2d 280, 282 (3rd DCA Fla.1998) [lien that includes overhead, among other things, is fraudulent]; *Onionskin v. DeCiccio,* 720 So.2d 257, 258 (5th DCA Fla.1998) [inclusion of costs for construction delays and lost profits arising out of breach of contract makes lien fraudulent]; *Martin v. Jack Yanks Construction Co.,* 650 So.2d 120, 121 (3rd DCA Fla.1995) [recovery of overhead and profit not within ambit of the lien law].

▪ In this case, the Owner–Defendants allege that the Debtor exaggerated its claim of lien by reducing the credit associated with its failure to complete the Chinese arch and walkway and by including delay charges that had not been agreed to by the parties. As to the first, the record is clear that neither party complied with the procedures outlined in the contract in attempting to resolve their dispute as to the appropriate credit that should be given for the incomplete work. Accordingly, the credit to be given for the incomplete Chinese arch and walkway was a good faith dispute excluded from the statute.

▪ This Court cannot reach the same conclusion as to the delay charges. The Debtor's verbal warning that later charges would be assessed based on delays included in agreed change orders was ineffective to change the terms of the contract. The contract clearly provided that change orders were to include all changes in the contract terms setting out changes in the work, delays in time, and costs associated with both. Failing agreement on these terms, the change orders were to exclude the costs for later determination. Here, the parties executed agreed change orders that on their face contained all of the required information.

Moreover, the contract provided a mechanism by which the Debtor could seek additional charges for delays and set forth a specific procedure by which that would occur. To comply with this procedure the Debtor had to assert a formal claim, including an estimate of the delay and the additional costs associated with the delay, within 21 days of the event giving rise to the delay or within 21 days of the time the Debtor learned of the conditions causing the delay.

The Debtor contends that Change Order No. 32 satisfies the formal claim requirement. The Debtor clearly did not rely upon that change order as a formal claim as it later receded from the calculation of the credit to be applied for its failure to complete the Chinese arch and walkway that was also included in that change order. The Debtor adjusted that credit from $21,000 to $14,000 without completing any additional paperwork. More importantly, the Debtor promulgated Change Order 32 approximately ten months after delay first became an issue in the Project, a time much later than the 21 days required by the contract. The record is uncontroverted that delay was an issue as early as December 2000.

This Court is satisfied that while at first blush, the matter might be nothing more than a bona fide contract dispute, the surrounding circumstances of the transactions speaks against this conclusion. The Debtor's reliance on change orders it executed *after* the submission of its application for final draw and affidavit of payment of obligations, however, makes its position untenable. The Owner–Defendants are entitled to rely upon the contractor's application for final payment. 36 *Florida Jur 2d,* Mechanics' Liens § 91 (1996). The Debtor's undisputed knowledge that its affidavit of payment of debts and obligations was inaccurate and that it had not obtained lien

waivers or releases from unpaid subcontractors and materials and equipment suppliers when it recorded its construction lien removes all benefit of the doubt that might be accorded to the Debtor's actions. Accordingly, this Court concludes that the Debtor's construction lien was willfully fraudulent within the meaning of the statute and is therefore unenforceable.

■ The Owner–Defendants contend that they are entitled to punitive damages as a matter of law once this Court determines that the mechanics lien is willfully fraudulent and therefore unenforceable under the statute. It is well established that the law of punitive damages does not automatically flow from the finding that a construction lien was found fraudulent. *See e.g. Levin*, 840 So.2d at 317 [declining to award punitive damages absent assertion of claim supported by a reasonable evidentiary basis]; *Ponce Investments, Inc.*, 718 So.2d at 282 [holding lien to be fraudulent with no award of punitive damages]; *Delta Painting, Inc. v. Baumann*, 710 So.2d 663, 664 (3rd DCA Fla.1998) [striking fraudulent lien without award of punitive damages]; *Onionskin*, 720 So.2d at 258 [striking fraudulent claim without award of punitive damages]. *Cf. Martin*, 650 So.2d at 121 [awarding punitive damages as a matter of law where fraudulent lien was "far beyond anything that could have possibly been owed to the contractor"].

In *Vinci Development Co. v. Connell*, 509 So.2d 1128, 1133 (2nd DCA Fla.1987), the court concluded that the statute was directory as to punitive damages rather than mandatory. The court reasoned that the ceiling placed on the maximum punitive damages available under the statute and the absence of a floor for minimum punitive damages signaled the legislature's intention to allow the court to exercise its discretion in awarding punitive damages. *Id.* The court further reasoned that "[t]he nature of the wrongful act that will support [an award of punitive damages] must be characterized by some circumstance of aggravation and involve conduct that has often been described as 'outrageous.'" *Id.*

■ This is in accord with the general provisions of Florida Statutes Section 768.72. That section provides that no claim for punitive damages may be permitted unless there is an evidentiary basis to support it. *Id.* Moreover, the party seeking punitive damages must establish their entitlement by clear and convincing evidence. Fl.St. § 768.725.

■ The Owner–Defendants have not established by clear and convincing evidence that punitive damages are warranted on the facts of this case. The Debtor's conduct was not "outrageous." Although the Debtor did not act in good faith in willfully exaggerating its construction lien, it was not without provocation by the Owner–Defendants. To award punitive damages in these circumstances would unfairly reward the Owner–Defendants.

■ Having concluded that the Debtor's construction lien is unenforceable, this leaves for consideration whether the Debtor has a claim for the remaining balance due under the contact. The Debtor has conceded that it submitted an inaccurate affidavit certifying its payment of debts and obligations to subcontractors and suppliers. The Debtor has also conceded that it failed to obtain waivers or releases of liens from subcontractors and suppliers prior to its submission of its application for final payment and its affidavit of payment of debts and obligations.[6] The Debtor,

---

**6.** Indeed, The Debtor concedes that, absent a recovery in this litigation, it is unlikely that it will ever be able to perform its obligations under the contract.

369

therefore, has failed to perform its obligations under the contract that trigger the Owner–Defendant's obligation to pay. Accordingly, the Debtor cannot establish its entitlement to money damages for breach of contract.

For the reasons stated above, this Court is satisfied that the Debtor has no rights in the contract proceeds or that the Debtor has no valid lien against the Owner–Defendants' real property and judgment will be entered in accordance to the foregoing in favor of the Owner–Defendants and against the Debtor.

This Court is satisfied that it is appropriate to vacate all defaults entered against the Third Party Defendants (Document Nos. 63–68) and dismiss all claims asserted by or against Third Party Defendants and Keene Brothers (Document Nos. 24, 29, and 49) without prejudice to the rights of the Third Party Defendants and Keene Brothers to bring their claims in other forums.

The appropriate award of attorneys' fees, if any, in favor of the Owner–Defendants against the Debtor shall be heard with proper notice to parties in interest.